1
2
3
4
5
6
7

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MICHAEL V. LUJAN,

           Petitioner,                    2: 06 - cv - 923 - LKK TJB

    vs.

WARDEN JAMES YATES,

           Respondent.          ORDER, FINDINGS AND

                                    RECOMMENDATIONS

_____/

## I.  INTRODUCTION

Petitioner, Michael Lujan, is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner is currently serving a sentence of thirty-years to life plus fifty-three years following his conviction by a jury of five counts of lewd and lascivious acts upon a child under the age of fourteen years and one count of aggravated sexual assault.  Petitioner raises several claims in his federal habeas petition; specifically:  (1) ineffective assistance of trial counsel ("Claim I"); (2) ineffective assistance of counsel who represented Petitioner during the motion for a new trial proceedings ("Claim II"); and (3) the trial court erred in sentencing Petitioner to the upper-term ("Claim III").  For the following reasons, the habeas petition should be denied.

1

## II.  FACTUAL AND PROCEDURAL BACKGROUND[1]

Defendant had two children with Sherri, the victim and "little Michael."  Defendant and Sherri were never married, and were not living together during the events at issue.

On January 17, 1999, defendant agreed to take Sherri to visit her youngest child's father at Folsom State Prison, and to baby-sit the victim and her brother while Sherri was visiting.  Defendant picked up Sherri around 7:00 or 8:00 a.m.  They stopped to get gas, then went to the prison.  [FN 3]  When defendant left Sherri at the prison, it was with the understanding that she would call him at his sister's house at 3:00 p.m, or he would automatically return at 3:00 p.m. to take her home.  When Sherri exited the prison at 3:00 p.m. defendant was not there.  She called both defendant's sisters, but was unable to reach him at either place.  She ultimately located defendant and he arrived at the prison around 4:00 or 5:00 p.m. Sherri noticed her daughter, who was five years old, was unusually quiet on the way home and that she was dressed in different clothes than she had been wearing that morning.
[FN 3]  The parties agreed it took approximately 30 minutes to get from Sacramento to the prison.

After Sherri and her daughter arrived home around 5:30 p.m., the daughter went into the bathroom where Sherri's niece, Angela, was styling her hair.  Sherri overheard her daughter tell Angela that her stomach hurt.  Angela asked the victim why her stomach hurt, and the victim told Angela to shut the door.  A few minutes later, Angela came storming out of the bathroom, yelling at Sherri that she was "sick" for letting her daughter go with defendant.  Angela told Sherri what the victim had told her.

Sherri spoke to her daughter, who refused to say anything at first for fear she would get in trouble.  Eventually, the victim told Sherri that while her brother was asleep on the couch, defendant put her on the bed, lay on top of her, and kissed her neck.  He rubbed pink lotion on her, then lay on top of her and "tried to hump her."  The victim said after it was over defendant made her take a bath and change her clothes.

Sherri called the police, who took a statement from the victim. The victim described sexual intercourse with her father, and described her father's ejaculation.  She said her father wanted her to orally copulate him, but she refused.  She also described defendant rubbing lotion on her, including her "private part" and said defendant licked her "private part."  Defendant also tried to

---

[1] The factual background is taken from the California Court of Appeal, Third Appellate District opinion which was attached as Exhibit 1 to Respondent's answer (hereinafter the "Slip Op.").

stick his tongue in her mouth.  Defendant told his daughter not to tell anyone what had happened or he would hurt her, and he made her take a bath.

A nurse practitioner conducted a sexual assault exam on the victim. The victim consistently recounted the event to the nurse.  The nurse found a small laceration above the victim's urethra, and generalized redness inside the labia.  Petechia is common where a child has been fondled, however the victim also had a skin condition called lichen sclerosis, which makes skin friable. Because of the lichen sclerosis, the nurse could not conclude that the abrasion and the petechia were consistent with sexual assault. Several days later, a social worker interviewed the victim at the Multi-Disciplinary Interview Center (MDIC).  The victim's story remained consistent.  The victim told the social worker her father said he would "knock the hell out of [her]" if she told anyone what happened.

The victim was nine years old at the time of trial.  Although her memory of the molestation was not as good, she testified she remembered her dad touching his privates to her privates and moving back and forth, licking her, and asking her to lick him.  She testified she had told the truth at the MDIC.

The victim's underwear and a rape kit containing vulvar swabs and [sic] were sent to the laboratory for analysis.  Sperm heads were detected on one of the vulvar swabs.  Spermatozoa were also found on the crotch area of the victim's underwear, but no sperm were found on a control slide from another area of the underwear.  A DNA analysis was performed on the sperm from the victim's underwear.  The sperm was consistent with defendant's DNA.

The defense theory was that defendant had not had time on the day in question to molest his daughter, and that the sperm had transferred to the victim's underwear in the wash.

Gina, defendant's sister, testified defendant came by her house on the day in question around 10:00 or 10:30 a.m.  He left after receiving a page around 11:00 a.m.  He left the victim and her brother with Gina.  When defendant returned to pick up the children, he had Sherri with him.  Gina also testified she remembered the day because it was a school day and her daughter stayed home from school that day.  In fact, January 17, 1999, was a Sunday.

Two other witnesses gave an accounting of defendant's and the victim's whereabouts that was inconsistent with Gina's testimony. Bonnie Kirby, defendant's ex-girlfriend, testified that on the date in question, she was living with Griselda Monroy.  Kirby left for work around 9:30 in the morning and left her mother, Anita Chinn, to baby-sit her daughter.  Kirby called home shortly after 12:00

3

p.m.  While she was speaking to her mother, Kirby could hear defendant, the victim, and Monroy in the background.  She called back again around 3:10 and again around 5:00 p.m.  She did not hear defendant in the background either of those times.

Monroy testified that she was at home with Chinn and Kirby's daughter on January 17, 1999.  At about 10:30 or 11:00 a.m, she paged defendant to ask him to take her to run some errands.  He arrived at her apartment about 40 minutes later with the victim and her brother.  Defendant and Monroy left the children with Chinn while they ran errands and purchased marijuana.  They returned back to the apartment around 1:30 or 2:00 p.m.  Defendant left with the children around 3:00 p.m.

Defendant's sister, Marjorie, testified the victim recanted and said she had lied about her father.  Sherri testified the victim would tell defendant's family he had not molested her, and tell Sherri's family he had molested her.  The victim also asked Sherri if she and defendant would get back together if the allegations were not true, and Sherri told her yes just to "shut her up."

Defendant presented evidence at trial of a study showing a small number of sperm can be transferred from garment to garment in the wash.  The People's expert opined that the number of sperm head on the victim's underwear in this case was much greater than the number observed in the study, leading him to conclude that the sperm on the victim's underwear had not been transferred by washing.

Defendant stipulated to a 1986 conviction for rape. Defendant was charged with five violations of section 288, subdivision (b), lewd and lascivious acts upon a child under the age of 14.  He was also charged with violating section 269, aggravated sexual assault committed by force against a child under the age of 14 and more than 10 years younger than defendant. Counts one through five were non-specific as to the acts committed.  The trial court gave a unanimity instruction.  The prosecution argued agreement that any of the following touchings occurred would be sufficient to convict defendant of violating section 288, subdivision (b):  (1) taking off the victim's clothes; (2) kissing her on the neck or mouth; (3) putting lotion on her; (4) orally copulating her; or (5) putting his penis in her genitalia. After the jury returned its verdict of guilty on all six counts, defendant made a motion for new trial on the ground his trial counsel provided inadequate representation.  Defendant argued, inter alia, that his trial counsel had failed to hire an investigator for a period of 29 months, during which time Anita Chinn died, having never been interviewed.

The trial court denied the motion for a new trial, and on the issue of the Anita Chinn testimony stated that there was no evidence

1   anyone knew Chinn, who was in her fifties, was about to die.  The
    trial court stated there was no certainty Chinn's testimony would
2   have materially benefitted defendant because the fact that Chinn
    was babysitting the victim was already in evidence through the
3   testimony of Monroy and Kirby.

4   (Slip Op. at p. 2-7 (footnote omitted).)

5       Petitioner filed an appeal to the California Court of Appeal, Third Appellate District

6   raising the claims he raises in his amended federal habeas petition amongst others.  That court

7   denied Petitioner's claims that he raises in this amended federal habeas petition.[2]  Petitioner then

8   filed a petition for review in the California Supreme Court.  The California Supreme Court

9   denied the petition for review on May 11, 2005 and stated the following: "Petition for review

10  denied without prejudice to any relief to which defendant might be entitled after this court

11  determines in <u>People v. Black</u>, S126182, and <u>People v. Towne</u>, S125667, the effect of <u>Blakely v.</u>

12  <u>Washington</u>, (2004) – U.S. –, 124 S.Ct. 2531, on California law." (Resp't's Lodged Doc. 4.)

13      Petitioner filed a federal habeas petition on April 14, 2006.  Respondent subsequently

14  filed a motion to dismiss since Petitioner's federal habeas petition was "mixed" as it included

15  both exhausted and unexhausted claims.  On March 20, 2007, Magistrate Judge Brennan

16  recommended that Respondent's motion to dismiss for lack of exhaustion be granted.

17      On April 24, 2007, Petitioner filed an amended habeas petition.  On May 8, 2007, District

18  Judge Karlton adopted Magistrate Judge Brennan's findings and recommendations dismissing

19  Petitioner's originally-filed federal habeas petition.  On June 18, 2008, District Judge Karlton

20  vacated the May 8, 2007 entry of judgment and referred the matter back to Magistrate Judge

21  Brennan for further proceedings on Petitioner's April 24, 2007 amended federal habeas petition.

22      Subsequently, Respondent filed a motion to dismiss Petitioner's amended habeas petition

23  as untimely.  The motion to dismiss was ultimately denied by District Judge Karlton.  (Dkt. No.

24  43.)  Respondent answered the amended habeas petition on February 11, 2010.  Petitioner filed a

25

26  _____

   [2] The California Court of Appeal reversed for resentencing on an issue not implicated in
   this federal habeas action.

5

traverse on March 22, 2010.  The matter was reassigned to the undersigned on January 25, 2011

by Chief Judge Ishii.  It is now ripe for adjudication.

### III.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state

court can only be granted for violations of the Constitution or laws of the United States.  See 28

U.S.C. § 2254(a); see also Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1993); Middleton v.

Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)).

Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus the Antiterrorism

and Effective Death Penalty Act of 1996 ("AEDPA") applies.  See Lindh v. Murphy, 521 U.S.

320, 326 (1997).  Under AEDPA, federal habeas corpus relief is not available for any claim

decided on the merits in the state court proceedings unless the state court's adjudication of the

claim:  (1) resulted in a decision that was contrary to, or involved an unreasonable application of,

clearly established federal law, as determined by the Supreme Court of the United States; or (2)

resulted in a decision that was based on an unreasonable determination of the facts in light of the

evidence presented in state court.  See 28 U.S.C. 2254(d).

As a threshold matter, this Court must "first decide what constitutes 'clearly established

Federal law, as determined by the Supreme Court of the United States.'"  Lockyer v. Andrande,

538 U.S. 63, 71 (2003) ((quoting 28 U.S.C. § 2254(d)(1)).  "'[C]learly established federal law'

under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court

at the time the state court renders its decision.'"  Id. (citations omitted).  Under the unreasonable

application clause, a federal habeas court making the unreasonable application inquiry should ask

whether the state court's application of clearly established federal law was "objectively

unreasonable."  See Williams v. Taylor, 529 U.S. 362, 409 (2000).  Thus, "a federal court may

not issue the writ simply because the court concludes in its independent judgment that the

relevant state court decision applied clearly established federal law erroneously or incorrectly.

Rather, that application must also be unreasonable."  Id. at 411.  Although only Supreme Court

6

law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is an objectively unreasonable application of clearly established federal law.  See Clark v. Murphy, 331 F.3d 1062, 1070 (9th Cir. 2003) ("While only the Supreme Court's precedents are binding . . . and only those precedents need be reasonably applied, we may look for guidance to circuit precedents.").

The first step in applying AEDPA's standards is to "identify the state court decision that is appropriate for our review."  See Barker v. Fleming, 423 F.3d 1085, 1091 (9th Cir. 2005). When more than one court adjudicated Petitioner's claims, a federal habeas court analyzes the last reasoned decision.  Id. (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).  The last reasoned decision is from the California Court of Appeal in its January 27, 2005 decision.  As previously stated, Petitioner raised all of the claims he raises in this federal habeas petition in his state habeas petition to the California Supreme Court which provided no reasoning for its denial.

IV.  ANALYSIS OF PETITIONER'S CLAIMS

A.  Claim I

In Claim I of Petitioner's amended federal habeas petition, he argues that trial counsel was ineffective.  Petitioner's arguments within Claim I fall into two categories.  First, Petitioner asserts that trial counsel was ineffective in failing to investigate the case for twenty-nine months. During this delay, Petitioner asserts that he lost the chance to get testimony from a key witness, Ms. Anita Chinn, who passed away during this time period.  Second, Petitioner argues that trial counsel was ineffective by failing to obtain and introduce key documentary evidence during trial. The California Court of Appeal analyzed these arguments on direct appeal and stated the following:

> Defendant argues his trial counsel, Emmett Mahle, unreasonably delayed in investigating his case.  He argues that as a result of the delay, Anita Chinn died before she could be interviewed and Folsom's Prison's visitor records were destroyed before they could be obtained.
>
> Mahle was appointed to represent defendant in May 1999.  Mahle

7

did not obtain the services of an investigator until October 1, 2001. When asked by defendant's subsequently appointed counsel why he waited so long to appoint an investigator, Mahle replied merely that his investigator "had plenty of time, eleven months, to complete tasks assigned to him before the case went to jury trial." We agree that Mahle's failure to hire an investigator for a period of 29 months "fell below an objective standard of reasonableness under prevailing professional norms . . . ." (People v. Kelly, supra, 1 Cal.4th at p. 520.) There could have been no benefit to waiting to investigate the case, and by waiting counsel risked witnesses forgetting relevant facts or dying before a statement could be obtained. However, there is not a reasonable probability that but for Mahle's error, the result would have been different.

Defendant argues Mahle's failure to investigate resulted in the loss of Chinn's testimony. There is not a reasonable probability that Chinn's testimony would have changed the result of the trial. At most, Chinn's testimony would have merely bolstered the testimony of Kirby and Monroy. Both Kirby and Monroy gave testimony placing defendant at Kirby's apartment on the afternoon of January 17.

Assuming the jury believed Monroy and Kirby, the jury could nevertheless have concluded, as the prosecution argued, that defendant had time to molest his daughter. If the jury believed Monroy and Kirby, it necessarily had to discount the testimony of defendant's sister, Gina, who claimed the victim was with her. This leaves two large gaps in time when defendant could have accomplished the molestation. Defendant dropped Sherri off at the prison between 7:30 and 8:30 a.m., allowing 30 minutes to drive to the prison. Allowing another 30 minutes to drive home, defendant and the children could have returned home between 8:30 and 9:30. Monroy testified defendant did not arrive at her apartment until approximately 40 minutes after she paged him around 10:30 or 11:00 a.m. This leaves a period of two to three hours for which defendant's actions are unaccounted. In the afternoon, Monroy testified she and defendant returned to her apartment after running errands between 1:30 and 2:00 p.m. They then smoked marijuana for 15 or 20 minutes, and defendant stayed another half hour before he left with the children. This means defendant could have left as early as 2:15 p.m. Sherri testified defendant picked her up around 4:00 or 5:00 p.m. This leaves another period of over two hours for which defendant's actions are unaccounted. Chinn's testimony would not have resolved this problem with the alibi defense.

Defendant also argues Mahle's delay in investigating the case resulted in Folsom Prison's visitor records being destroyed before defendant could obtain them. He argues the visitor records would have established when he dropped off Sherri and when he picked her up.

> The time defendant dropped off Sherri was not at issue, as Sherri's testimony that defendant picked her up at her house between 7:00 and 8:00 a.m. was undisputed.  In the afternoon, Sherri testified she went outside to the parking lot at 3:00 p.m.  She waited 10 to 15 minutes or longer, then went back inside to use the phone.  After about an hour she reached defendant.
>
> There is no evidence that Sherri would have had to sign a visitor's log to use the telephone, and it is not clear from the record that she waited inside until defendant picked her up.  Thus, it is sheer speculation that the visitor records would have she any light on the time defendant arrived to pick her up.  Certainly, defendant has not shown a reasonable probability that introduction of the records would have changed the result of his trial . . . .
>
> Defendant asserts Mahle was incompetent because he failed to obtain telephone and pager records that would have documented his whereabouts during the day in question.  Defendant's mere assertion does not meet his burden of showing a reasonable probability that the result of the trial would have been different.  Defendant makes no showing as to the actual contents of the phone records.
>
> We conclude that although Mahle's representation fell below an objective standard of reasonableness, there was no prejudice.

(Slip Op. at p. 8-11.)

The Sixth Amendment guarantees effective assistance of counsel.  In Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court articulated the test for demonstrating ineffective assistance of counsel.  First, the petitioner must show that considering all the circumstances, counsel's performance fell below an objective standard of reasonableness.  See id. at 688.  Petitioner must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment.  See id. at 690.  The federal court must then determine whether in light of all the circumstances, the identified acts or omissions were outside the range of professional competent assistance.  See id.

Second, a petitioner must affirmatively prove prejudice.  See id. at 693.  Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A reasonable probability is "a probability sufficient to undermine the confidence in the outcome."  Id.  A reviewing court "need

1   not determine whether counsel's performance was deficient before examining the prejudice

2   suffered by defendant as a result of the alleged deficiencies . . . [i]f it is easier to dispose of an

3   ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be

4   followed." Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (citing Strickland, 466 U.S. at

5   597).

6          In this case, it is easier to dispose of Petitioner's ineffectiveness arguments with respect to

7   trial counsel on the ground of a lack of sufficient prejudice.  Petitioner failed to show that his

8   counsel's delay in investigating the matter would have changed the outcome of the proceedings

9   to a reasonable probability.  With respect to the delay and the ultimate untimely death of Ms.

10  Chinn, it is at best unclear what additional information if any she would have added to the

11  defense.  Ms. Chinn babysat the Petitioner's two children (the victim and little Michael) while

12  Petitioner and Ms. Monroy were running errands.  However, as noted by the California Court of

13  Appeal, there remained significant gaps of time during the course of the day which gave

14  Petitioner the opportunity to commit the crime.  Petitioner does not show that the testimony of

15  Ms. Chinn would have added any additional information not provided by Ms. Monroy, and

16  certainly not to a reasonable probability to change the outcome of the trial.  Petitioner failed to

17  show that the California Court of Appeal's decision on this argument was an objectively

18  unreasonable application of clearly established federal law.  Petitioner is not entitled to federal

19  habeas relief based on his ineffective assistance counsel argument regarding the twenty-nine

20  month delay in which time Ms. Chinn passed away.

21         Next, Petitioner argues that trial counsel's delay caused the Folsom Prison's visitor

22  records log to be destroyed before Petitioner could obtain them.   Petitioner asserts that

23  "[e]vidence of Folsom's visitor' logs would have ben powerful proof of [his] innocence, since it

24  would have established when he dropped Martinez-Bruno off at the prison and when he picked

25  her up, which was critical to his alibi defense."  (Pet'r's Am. Pet. at p. 34.)  As with Petitioner's

26  prior ineffective assistance argument, he failed to show to a reasonable probability that the

1   outcome of the proceeding would have been different had his counsel not delayed and gotten

2   these records.  The California Court of Appeal's decision was not an objectively unreasonable

3   application of clearly established federal law.  As it noted, it would be sheer speculation that the

4   visitor logs would have resulted in a more exact time when Petitioner picked Sherri up at the

5   prison.  Furthermore, as previously noted, there remained gaps of time during the day where the

6   molestation still could have taken place.  Under these circumstances, Petitioner failed to show

7   that he was prejudiced.  Petitioner is not entitled to federal habeas relief on this argument as well.

8        Next, Petitioner argues that trial counsel was ineffective for failing to investigate and

9   introduce evidence of telephone and pager records.  Petitioner asserts that these records "would

10   have documented [Petitioner's] whereabouts at various points from about 10:30 or 11:00 a.m.

11   until he left to pick up Martinez-Bruno up at Folsom."  (Id. at p. 33.)  Specifically, Petitioner

12   states that these records:

13        would have documented (1) the page Monroy sent [Petitioner]
         about 10:30 or 11:00 a.m. (RT 1397); (2) the page [Petitioner]
14        received at Carrillo's home at about 11:00 a.m. (RT 893); (3) the
         telephone call [Petitioner]  made to Monroy 20 minutes after he
15        received her page (RT 1398); (4) the telephone calls Kirby made
         from her office to her home shortly after noon and at around 3:10
16        or 3:15 p.m. (RT 968-969, 981-983); (5) the page [Petitioner]
         received at Kirby's home between about 2:30 and 3:00 p.m. (RT
17        1412); (6) the telephone call [Petitioner] made from Kirby's home
         after receiving that page (RT 1412); (7) the collect telephone calls
18        Martinez-Bruno made from prison to her mother, grandmother,
         sister, and [Petitioner's] sisters (RT 342-343); (8) the second
19        collect telephone call made to her mother's home, during which
         she spoke to [Petitioner] (RT 343-344).
20

21   (Id.)  Once again, Petitioner has failed to show to a reasonable probability that the outcome of the

22   trial would have been different had trial counsel investigated and obtained these phone and pager

23   records.  Petitioner does not present these records.  It is at best unclear what these records would

24   have added to the defense in light of the testimony that was already produced at trial regarding

25   Petitioner's whereabouts on the day of the molestation.  Under these circumstances, Petitioner

26   failed to show prejudice to warrant federal habeas relief on this ineffective assistance of counsel

1   argument.  Because Petitioner failed to show that he was prejudiced under the <u>Strickland</u>

2   standard, the California Court of Appeal decision rejecting this ineffective assistance argument

3   was not an objectively unreasonable application of clearly established federal law.

4        In his Petition and in his traverse, Petitioner appears to argue for the first time that Mr.

5   Mahle was ineffective for failing to call Dr. Crawford as a witness during trial.  (<u>See</u> Pet'r's Am.

6   Pet. at p. 5 and Pet'r's Traverse at p. 4.)  Petitioner's asserts that Dr. Crawford's testimony would

7   have impacted Petitioner's claim of innocence.  (<u>See</u> <u>id.</u>)  This ineffective assistance of counsel

8   argument was not raised by Petitioner to the California Supreme Court on direct appeal.  Thus, it

9   may be unexhausted.  However, even though the claim may be unexhausted, a federal habeas

10  court can deny an unexhausted claim on the merits so long as it is deemed not "colorable."

11  <u>See</u> <u>Cassett v. Stewart</u>, 406 F.3d 614, 624 (9th Cir. 2005).  Petitioner does not come forward with

12  what Dr. Crawford's testimony would have been.  Thus he has not shown to a reasonable

13  probability that the outcome of the proceeding would have been different had Dr. Crawford been

14  called as a witness.  Therefore, this argument does not raise a "colorable" ineffective assistance

15  of counsel claim.  Petitioner failed to show that he was prejudiced by any purported

16  ineffectiveness by trial counsel.

17      B.  Claim II

18       In Claim II of Petitioner's amended federal habeas petition, Petitioner asserts his counsel

19  on his new trial motion (Mr. Bradley Holmes) was ineffective.  Petitioner argues that Mr.

20  Holmes failed to argue during the motion for a new trial that Mr. Mahle's ineffective assistance

21  of counsel at trial caused Petitioner to suffer prejudice.  (<u>See</u> Pet'r's Am. Pet. at p. 4.)  Petitioner

22  also attaches a portion of his state court habeas petition to his amended federal habeas petition.

23  Among the pages that Petitioner included within that attachment was Petitioner's argument

24  before the state courts that Mr. Holmes was also ineffective for conceding the prejudice and

25  DNA issue, confusing various facts and issues, presenting inadmissible documentation and

26  failing to argue that trial counsel was ineffective for failing to obtain the prison's visitor logs as

well as the telephone and pager records.  (See id. at p. 38.)  Construing the *pro se* federal habeas

petition liberally, these additional arguments will be considered as well.  The California Court of

Appeal analyzed these arguments on direct appeal and stated the following:

> After Mahle asked to be relieved from the case because of a breakdown in communication with defendant, the trial court appointed Bradley Holmes to represent defendant.  Holmes filed and argued a motion for a new trial, and defendant now argues he was not adequately represented by Holmes with respect to the motion for new trial.
>
> Defendant first argues Holmes's representation was deficient because he did not argue defendant was prejudiced by Mahle's performance.  In light of our holding that there was no prejudice, Holmes cannot be said to have been deficient for failing to make such an argument.
>
> In any event, the record indicates Holmes argued both that he needed to put Mahle on the stand in order to prove prejudice and that defendant had been prejudiced.  Holmes urged the trial court to put Mahle on the stand and argued, "I think I can perhaps establish some prejudice through the testimony of Mr. Mahle . . . ."  Holmes also argued defendant was prejudiced by Mahle's failure to preserve Chinn's testimony because her testimony would have shown there was no time for defendant to have done the acts charged.
>
> Defendant argues Holmes "conceded all three factors that convinced the court there was no prejudice . . . ."  Defendant claims Holmes conceded the victim's credibility, the DNA evidence, and that defendant had an hour to molest the victim after he lift [sic] Kirby's apartment.  We find no concessions in the record.
>
> Holmes acknowledged that child molestation cases are difficult because the jury loves the victim and hates the defense, but Holmes then pointed out that it was the defense counsel's responsibility to make sure defendant had a fair trial and that every attempt had been made to investigate the case thoroughly.  This did not amount to conceding the victim's credibility.
>
> Defendant claims Holmes "conceded" the DNA issue by arguing the washing machine transfer theory was "pathetic" and "almost laughable."  However, Holmes went on to argue that a more plausible theory would have been that the victim was wearing panties that had been in contact with her dad's underwear in the clothes hamper.  This was not a concession of the DNA issue.  Defendant asserts Holmes agreed with the court that defendant had time to molest his daughter before he left to pick up Sherri in the

afternoon.  However, this was part of Holmes's argument that Mahle should have called defendant as a witness to close the time gaps.  There was no concession of the issue of prejudice in Holmes's argument.

Defendant argues Holmes made damaging arguments, such as the following statement regarding Chinn's death.  "They should have realized the importance of this witness.  [¶]  And, you know, two years go by, two-and-a-half years go by.  Pretty soon, this lady dies.  We all die.  She could have died fifteen minutes after this happened, two years later.  She could have lived to 103.  We never know that.  The point is, if they had done this in proper order –"  Defendant does not explain why this argument was prejudicial.  In any event it was made for the obvious tactical purpose of arguing Mahle had an obligation to investigate the case in a timely manner because witnesses can die at any time.

Defendant argues Holmes talked about defendant's sister, Gina's testimony, but erroneously attributed it to defendant's other sister, Marjorie.  Defendant fails to explain how this prejudiced him.  Holmes did not have the benefit of sitting through the trial, but the trial judge did.  We can assume that the trial judge knew which sister Holmes was talking about.

Defendant claims Holmes's argument that Mahle should have put defendant on the stand to account for his actions between leaving Monroy's apartment and picking up Sherri was "incoherent, factually incorrect, misleading, and contradicted by his subsequent argument . . . ."  Again, defendant fails to show how he was prejudiced by Holmes's argument.  The trial court was aware of the evidence.  Furthermore, the trial court appeared to understand that Holmes was arguing Mahle should have put defendant on the stand to fill in the gaps of time, because it pointed out to Holmes that Mahle had a good reason for not putting defendant on the stand:  "He has a number of impeachable priors."

Defendant complains that many of the documents Holmes offered in support of the new trial motion were inadmissible.  The first such document was a memorandum summarizing a telephone conversation between Holmes's investigator and Marjorie, in which Marjorie expressed that she had been unprepared to testify.  The trial court apparently considered the memorandum, even though it recognized the document was unsworn, because it found, "[w]hether additional preparation of witnesses would have affected their memories in court is pure guesswork."  The trial court considered, and dismissed, the argument regarding the preparation of witnesses, and the unsworn statements were not prejudicial to defendant.

Holmes also submitted two e-mails written by the DNA counsel, Robert Blasier, regarding Blasier's concern over Mahle's delay in

working up the case.  Defendant fails to show how the submission of these inadmissible documents prejudiced him.  The trial court apparently considered the evidence because in ruling on the new trial motion, the court stated:

> "[T]he fact that Mr. Mahle remained as trial counsel, despite his heavy case load, does not, in the Court's view, establish ineffective assistance. There were many legitimate reasons shown by the file why the matter came to trial so long after the defendant's arrest and prosecution, and defendant waived time and asked to do so. The defense attorneys, not one, but two of them, were, indeed, very busy, but their mutual reputations for legal advocacy kept them in great demand.  Defendant had the benefits of an experienced, seasoned, aggressive two-person defense team, and no prejudice has been shown by the various contingencies of the defendant of the prosecution in this case."

Finally, defendant argues Holmes was ineffective in failing to argue Mahle's failure to obtain and introduce Folsom Prison visitor logs and telephone pager records.  As we have determined, this did not constitute ineffective assistance on Mahle's part.

(Slip Op. at p. 11-15.)

Upon reviewing the record, the California Court of Appeal's decision on Petitioner's various ineffective assistance of counsel arguments against Mr. Holmes was not an objectively unreasonable application of clearly established federal law.  It analyzed Petitioner's arguments and found that Mr. Holmes' performance was not constitutionally deficient for some of the arguments and/or that Petitioner failed to show to a reasonable probability that the outcome of the new trial motion would have been different for others arguments.

For example, as explained by the California Court of Appeal, Mr. Holmes did attempt to argue that Petitioner was prejudiced by Mr. Mahle's performance at trial.  He specifically sought to have Mr. Mahle take the stand during the new trial proceedings and argued forcefully that Petitioner was prejudiced by Mr. Mahle's inaction thereby causing Petitioner to lose Ms. Chinn's testimony upon her untimely death.  (See Reporter's Tr. 1854-55.)  Furthermore, as noted by the California Court of Appeal in its decision, Petitioner failed to show that he was prejudiced by

15

1   Mr. Mahle's performance as trial counsel, therefore, Mr. Holmes purported failure to argue

2   prejudice could not have been prejudicial to Petitioner as well.

3        Additionally, upon reviewing the record Mr. Holmes did not concede the victim's

4   credibility nor did he concede the DNA issue.  Furthermore, the fact that Mr. Holmes mistook

5   Petitioner's sister Marjorie for Gina in arguing for the new trial did not prejudice Petitioner.

6   Petitioner failed to show to a reasonable probability that Mr. Holmes' mistake would have

7   resulted to a reasonable probability that the outcome of the new trial motion would have been

8   different.  Petitioner also failed to show that he was prejudiced by Mr. Holmes purported

9   introduction of inadmissible documentary evidence during the motion for a new trial hearing.  As

10  confirmed in the record, the judge apparently considered these unsworn and/or purportedly

11  inadmissible documents, yet still rejected Petitioner's motion for a new trial.  Finally, as

12  explained by the California Court of Appeal and in supra Part IV.A, Petitioner failed to show that

13  he was prejudiced by Mr. Mahle's failure to obtain and introduce the prisoner visitor logs and

14  telephone/pager records.  Therefore, Petitioner cannot show that he was prejudiced for Mr.

15  Holmes' failure to make this argument in the motion for a new trial proceedings.  Accordingly,

16  Petitioner's ineffective assistance of counsel arguments within Claim II do not warrant federal

17  habeas relief.

18        C.  Claim III

19        Finally, Petitioner argues that the trial judge erred by sentencing Petitioner to the upper-

20  term.  (See Pet'r's Am. Pet. at p. 5("Judge exceeding sentence to max-upper term.").)  In his

21  traverse, Petitioner states that, "[t]he trial court did in fact improperly sentence Petitioner to the

22  upper term based on his prior criminal history."  (Pet'r's Traverse at p. 1-2.)  It appears as if

23  Petitioner's argument within his amended federal habeas petition is that the trial judge's sentence

24  violated Blakely v. Washington, 542 U.S. 296 (2004).  The California Court of Appeal analyzed

25  this argument on direct appeal and stated the following:

26        [D]efendant argues the imposition of upper terms for counts 1, 3,

16

and 4, and consecutive terms for counts 1, 3, 4, and 6 violated his Fifth, Sixth and Fourteenth Amendment rights as set forth in Apprendi v. New Jersey, (2000) 530 U.S. 466 [147 L.Ed.2d 435] (Apprendi) and Blakely v. Washington (2004) 524 U.S. __ [159 L.Ed.2d 403] (Blakely).)

In Apprendi, the United States Supreme Court held "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (Apprendi, supra, 530 U.S. at p. 490 [at p. 455].) Apprendi was decided in 2000, before defendant's sentencing hearing in 2003.

Following Apprendi, and after defendant's sentencing hearing, the United States Supreme Court decided Blakely, and explained that the statutory maximum for Apprendi purposes "is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings." (Blakely, supra 524 U.S. at p. __ [at pp. 413-414.]

Here, the trial court gave the following reasons for imposing the upper term: "[I]t seems to me, if anyone deserves the upper term doubled and a serious response to the charges committed by this defendant against his own daughter, it's this one. He has a record that goes on for pages . . . since he was age 20. [¶] Virtually, he's gone through the Penal Code in terms of various crimes, the most [egregious], of course, was . . . rape in concert of a woman, followed by . . . physical assault upon her . . . ." Later, the trial court stated, "I have selected [the] upper term only because of the aggravating circumstances in this case, which are the defendant's substantial prison history, the fact that the victim was vulnerable, the fact that the offense indicated a high degree of cruelty, viciousness, and callousness, and the fact that the defendant's prior performance on both probation and parole have been unsatisfactory." Defendant argues the aggravating circumstances were based on judicial rather than jury factfinding, and therefore violate his constitutional rights under Apprendi and Blakely.

The trial court did not commit reversible error. A court may rely on a single aggravating factor as a basis for imposing an upper term sentence if that factor outweighs any circumstances in mitigation. (People v. Osband (1996) 13 Cal.4th 622, 728; People v. Brown (2000) 83 Cal.App.4th 1037, 1043.) Here, there were no circumstances in mitigation.

The rule set forth in Apprendi and Blakely does not apply to a prior conviction used to increase the penalty for a crime. (Blakely, supra, 524 U.S. at p. __ [159 L.Ed.2d at p. 412]; Apprendi, supra, 530 U.S. at pp. 487-488, 490 [147 L.Ed.2d at pp. 454, 455.) Here, the court was most disturbed by defendant's prior convictions, singling them out for censure, and after listing defendant's history

1    of convictions declaring, "[t]his is not a middle of the road case . . .

2    ."

3    "When a trial court has given both proper and improper reasons for
     a sentence choice, a reviewing court will set aside the sentence

4    only if it is reasonably probable that the trial court would have
     chosen a lesser sentence had it known that some of its reasons were

5    improper."  (People v. Price (1991) 1 Cal.4th 324, 492.)  Given the
     trial court's emphasis on defendant's record of prior convictions, a

6    fact the court properly considered under Apprendi and Blakely,
     there is no reasonable probability the trial court would have chosen

7    a lesser sentence had it known the other reasons it considered were
     improper.

8    (Slip Op. at p. 15-18.)

9          As explained by the California Court of Appeal in its decision, in Apprendi, the United

10   States Supreme Court held that "any fact (other than prior conviction) that increases the

11   maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven

12   beyond a reasonable doubt."  530 U.S. at 490.  In Blakely, the Supreme Court held that "the

13   statutory maximum for Apprendi purposes is the maximum sentence a judge may impose *solely*

14   *on the basis of the facts reflected in the jury verdict or admitted by the defendant.*"  542 U.S. at

15   303 (emphasis in original).  Next, in Cunningham v. California, 549 U.S. 270, 293 (2007), the

16   Supreme Court found that under California law, the middle, not the upper term, is the relevant

17   "statutory maximum" for Apprendi purposes, and therefore a defendant is entitled to a jury

18   finding before being sentenced to an upper term."

19         In this case, the trial judge weighed various aggravating factors in deciding whether to

20   sentence Petitioner to the upper term (there were no mitigating factors).  Among the things that

21   the trial judge stated in imposing the upper term was Petitioner's prior criminal history (see, e.g.,

22   Reporter's Tr. at 1887.), petitioner's substantial prison history, the fact that the victim was

23   vulnerable, that the crime involved a high degree of cruelty, viciousness, and callousness, and the

24   fact that the defendant's prior performances on probation and parole were unsatisfactory.  With

25   respect to Petitioner's prior criminal history, the judge explained that:

26         [I]f anyone deserved the upper term . . . it's this one.  He has a

18

1
2
3
4
5
6

> record that goes on for pages, uh, since he was age
> 20.  [¶]  Virtually, he's gone through the Penal Code in terms of
> various crimes, the most agregious [sic], of course, was which the
> rape in concert of a woman, followed by, uh, an assault by the
> defendant, physical assault upon her, hurting her after he had raped
> her, along with several others.  That's probably the worst of the
> bunch, but there are domestic violence convictions, uh, burglary
> convictions, receiving stolen property convictions, auto theft, uh a
> cornucopia of Penal Code violations, felonies and misdemeanors,
> throughout defendant's history.

7  (Id.)

8          In this case, Petitioner's upper term sentence is erroneous under Cunningham.

9  Specifically, some of the factors used by the trial judge in imposing the upper term were not

10  reflected by the jury's verdict or admitted by the Petitioner.

11          The Petitioner did waive a jury trial on his prior convictions.  The probation report

12  supplied to the sentencing judge included Petitioner's prior criminal convictions which included

13  vehicle theft, burglary, receiving stolen property, possession of stolen property, forcible rape,

14  possession of narcotics and domestic violence.  (See Clerk's Tr. at p. 360-62.)

15          Blakely and Apprendi sentencing errors are subject to harmless error analysis.  See

16  Washington v. Recuenco, 548 U.S. 212, 221 (2006).  Under California law, only one aggravating

17  factor is necessary to set the upper term as the maximum term.  See People v. Cruz, 38 Cal. App.

18  4th 427, 433, 45 Cal. Rptr. 2d 148 (1995).  Therefore, any Apprendi/Blakely error will be found

19  harmless if it is not prejudicial as to just one of the aggravating factors at issue.  See Butler v.

20  Curry, 528 F.3d 624, 648 (9th Cir. 2008).  Accordingly, because any Apprendi/Blakely error with

21  regard to Petitioner's numerous prior adult convictions finding is harmless, and California law

22  only requires one aggravating factor to impose the upper term, the state court' imposition of the

23  upper term on Petitioner's convictions was not improper as it relied in part on Petitioner's prior

24  convictions in sentencing Petitioner to the upper term.  See, e.g., Wilkins v. Strickland, Civ. No.

25  07-621, 2009 WL 257077, at *21 (E.D. Cal. Feb. 3, 2009).  Petitioner is not entitled to federal

26  habeas relief on Claim III.

1         V.  PETITIONER'S TRAVERSE

2         Petitioner raises a series of claims in his traverse which was filed on March 22, 2010 that

3    were not included in his amended federal habeas petition.  For example, Petitioner argues that his

4    trial counsel erred in failing to bifurcate his prior crimes and that the evidence in the case was

5    contaminated as there was a defective chain of custody.  (See Pet'r's Traverse at p. 2, 3.)

6    Because Petitioner only raises these issues in his traverse and not his petition itself, they will not

7    be considered.  See Cedano-Viera v. Ashcroft, 324 F.3d 1062, 1066 n.5 (9th Cir. 2003);

8    Carcoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994) ("A Traverse is not the proper

9    pleading to raise additional grounds for relief.").

10        VI.  REQUEST FOR AN EVIDENTIARY HEARING

11        Finally, Petitioner requests an evidentiary hearing on his Claims.  (See Pet'r's Traverse at

12   p. 5.)  A court presented with a request for an evidentiary hearing must first determine whether a

13   factual basis exists in the record to support petitioner's claims, and if not, whether an evidentiary

14   hearing "might be appropriate."  Baja v. Ducharme, 187 F.3d 1075, 1078 (9th Cir. 1999); see

15   also Earp v. Ornoski, 431 F.3d 1158, 1166 (9th Cir. 2005).  A petitioner requesting an

16   evidentiary hearing must also demonstrate that he has presented a "colorable claim for relief."

17   Earp, 431 F.3d at 1167 (citations omitted).  To show that a claim is "colorable," a petitioner is

18   "required to allege specific facts which, if true, would entitle him to relief."  Ortiz v. Stewart, 149

19   F.3d 923, 934 (9th Cir. 1998) (internal quotation marks and citation omitted).  In this case, an

20   evidentiary hearing is not warranted for the reasons stated in supra Part IV.  Petitioner failed to

21   demonstrate that he has a colorable claim for federal habeas relief.  Thus, his request will be

22   denied.

23        VII.  CONCLUSION

24        Accordingly, IT IS HEREBY ORDERED that Petitioner's request for an evidentiary

25   hearing is DENIED.

26        For all of the foregoing reasons, IT IS RECOMMENDED that the petition for writ of

20

1  habeas corpus be denied.

2      These findings and recommendations are submitted to the United States District Judge

3  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days

4  after being served with these findings and recommendations, any party may file written

5  objections with the court and serve a copy on all parties.  Such a document should be captioned

6  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

7  shall be served and filed within seven days after service of the objections.  The parties are

8  advised that failure to file objections within the specified time may waive the right to appeal the

9  District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).  In any objections he

10  elects to file, Petitioner may address whether a certificate of appealability should issue in the

11  event he elects to file an appeal from the judgment in this case.  See Rule 11, Federal Rules

12  Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability

13  when it enters a final order adverse to the applicant).

14  DATED:  February 10, 2011

15

16

17  _____

18  TIMOTHY J BOMMER
    UNITED STATES MAGISTRATE JUDGE

19

20

21

22

23

24

25

26